IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 1, 2020

IN RE JUDE M.

Appeal from the Chancery Court for Greene County
No. 2018-CV-365     Douglas T. Jenkins, Chancellor

No. E2020-00463-COA-R3-PT

This is a termination of parental rights case focusing on Jude M., the minor child ("the Child") of Sarah M. ("Mother") and Andy G. ("Father"). In November 2018, Father and his wife, Jamie G. ("Stepmother"), filed a petition in the Greene County Chancery Court ("trial court"), seeking to terminate the parental rights of Mother and allow Stepmother to adopt the Child. The Child previously had been removed from Mother's custody pursuant to an order entered by the Greene County Juvenile Court ("juvenile court") upon a petition for emergency custody filed by Father. Following a bench trial, the trial court granted the termination petition upon its finding by clear and convincing evidence that Mother had abandoned the Child by failing to visit her during the statutorily determinative period and that conditions leading to the removal of the Child from Mother's custody persisted. The trial court further found by clear and convincing evidence that it was in the Child's best interest to terminate Mother's parental rights. Mother has appealed. Having determined that Petitioners failed to demonstrate the threshold requirement of a petition having been filed in the juvenile court that alleged the Child to be a dependent and neglected child, we reverse the trial court's finding on the ground of persistence of the conditions leading to removal of the Child from Mother's custody. We affirm the trial court's judgment in all other respects, including the termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

Francis X. Santore, Jr., Greeneville, Tennessee, for the appellant, Sarah M.

Alex A. Chesnut, Greeneville, Tennessee, for the appellees, Andy G. and Jamie G.

## OPINION

### I. Factual and Procedural Background

Mother and Father were never married and never resided together. The Child was born in September 2011, and Father's parentage was subsequently established. The Child resided primarily with Mother throughout the first five years of his life, although testimony demonstrated that Father had visited with the Child at least to some extent and had paid child support during those years.

Mother testified during the termination hearing that she began to have difficulty coping with her situation when the Child was approximately two years of age. According to Mother, she and the Child were residing with Mother's parents when Mother's father committed suicide while Mother and the Child were at home. Mother acknowledged that during this time period, she developed an addiction to controlled substances. She stated that she had been employed for several years at that time as a psychiatric nursing assistant and had earned $15 an hour as her highest wage. However, Mother explained that she resigned from the position she held at a Veterans Administration Medical Center ("VA Medical Center") one year after her father died because she felt emotionally incapable of "sit[ting] with suicidal patients," which her job required. Mother further testified that after resigning, she "tried to get another job," but was unsuccessful and "just wasn't functional."

Upon a petition for emergency custody filed by Father, the juvenile court, with Judge Kenneth N. Bailey presiding, conducted a hearing on August 30, 2016, and subsequently entered an order on November 21, 2016, *nunc pro tunc* to the hearing date, awarding "temporary physical custody" of the Child to Father. We note that Father's juvenile court petition was not presented at trial and is not in the record before us. In its order, the juvenile court permitted Mother to have supervised visitation with the Child on alternate weekends with the visits to be supervised by the Child's maternal grandmother ("Maternal Grandmother"). In so ordering, the juvenile court found that Mother was "struggling to care for herself and the parties' minor child"; that Mother did "not have a stable residence and [was] unemployed," preventing her from "provid[ing] for the child financially"; and that Father was "stable, both financially and emotionally, and [could] provide appropriate care for the minor child." The juvenile court held Mother's child support obligation in abeyance and directed that upon agreement of the parties, Mother would be able to enjoy unsupervised visitation with the Child in the future. The juvenile court also ordered the parties to participate in mediation with the caveat that Maternal Grandmother would be allowed to participate in mediation as well.

2

Following mediation and a subsequent hearing, the juvenile court entered an order on December 21, 2016, approving the parties' mediated agreement ("the Mediated Agreement") as "fair and equitable" and "in the best interest of the child."[1] Incorporated into the juvenile court's order, the Mediated Agreement provided in full:

1.      Custody to Father.

2.      Mother to have visitation four (4) times per month at times of reasonable duration; supervised by a party or parties to be approved by the Father; length of time and approval not to be unreasonably withheld by the Father.

3.      Parties to communicate with each other appropriately.

4.      Mother's time in visitation to increase as she progresses in dealing with her issues.

5.      [Maternal] Grandmother's time in visitation not to cease absent a negative change in the child's circumstances.

6.      Mother to be required to pass drug screens, participate in mental health assessment and counseling, obtain employment, obtain suitable housing, and establish and maintain a stable life.

7.      Mother to execute releases for counselor to release information to Father and Court.

8.      Mother to have a drug screen monthly and upon probable cause demand by Father within 24 hours; results provided to Court at her expense.  To cease on 3 consecutive passed monthly drug screens, except on demand screens.

9.      No driver may drive the child without license and appropriate insurance.

Father and Stepmother (collectively, "Petitioners") initiated the instant action by filing a "Petition for Adoption and Termination of Parental Rights," on November 19,

---

[1] In its order approving the parties' mediated agreement, the juvenile court stated that the hearing had been conducted upon Father's "Petition for Emergency Custody and [to] Modify Permanent Parenting Plan."  However, the record contains no other indication that a permanent parenting plan order had ever been entered by any court.

2018. They alleged statutory grounds against Mother of abandonment through failure to visit and financially support the Child in the four months preceding the petition's filing and persistence of the conditions leading to the Child's removal from Mother's custody. Petitioners further alleged that termination of Mother's parental rights and adoption by Stepmother would be in the best interest of the Child.

Acting initially without benefit of counsel, Mother filed a response on January 2, 2019, objecting to termination of her parental rights. She concomitantly filed a uniform affidavit of indigency, stating that her total monthly income was $327, comprised of $190 in food stamps and $137 from Families First. She also stated in her affidavit that her net income for the last year she had paid taxes, 2016, had been $18,000. In March 2019, the trial court entered orders appointing, respectively, counsel to represent Mother and attorney Curtis Collins as a guardian *ad litem* ("GAL") on behalf of the Child.

Now acting through her appointed counsel, Mother filed a motion seeking to amend her answer and strike her *pro se* response on April 5, 2019. In her amended answer, Mother denied that any grounds for termination of her parental rights existed and objected to the petition for adoption. Specifically concerning Mother's visitation with the Child, Mother asserted that Maternal Grandmother had eventually told Mother "that she was afraid that [Father] would terminate her contact with the child if she allowed [Mother] to have in-person contact with the child." Mother therefore admitted that her visits with the Child had been "somewhat minimal" while asserting that this had been "through no fault of her own." We note that although the juvenile court initially had designated Maternal Grandmother as the individual to supervise Mother's visitation, the December 2016 order provided that visitation would be "supervised by a party or parties to be approved by the Father."

The trial court conducted a bench trial on November 5, 2019, during which Mother, Father, and Stepmother each testified. In addition, Petitioners presented testimony from an individual, A.P., for whom Stepmother regularly babysat, and Mother presented testimony from a longtime friend, C.M., who stated that he was a licensed clinical social worker and had been employed at the VA Medical Center and another facility alongside Mother in the past. At the close of trial, the GAL presented a recommendation to the trial court that termination of Mother's parental rights would be in the Child's best interest.

During trial, Mother testified that in the summer of 2016, she had begun "living at the river" at the Nolichucky Gorge Campground off the Appalachian Trail and was homeless for approximately a year. Mother maintained that prior to Father's gaining custody of the Child, she had often left the Child in the care of Maternal Grandmother during this time. Mother stated that she "spent a lot of time in nature trying to not use

drugs to cope with [her] father's suicide" and that although she knew this method of coping "looks bad," she "got better." Mother also testified that in February 2017, she began working as a nanny for two children in exchange for a rent-free apartment over which her employer was the landlord. According to Mother, she vacated the apartment when her landlord/employer sold the building, which was also during the time period that she became pregnant with her second child, a daughter who by the time of trial was approximately one year of age.

Mother further testified that when her employment as a nanny ended, she successfully applied for public housing in Johnson City, Tennessee, and had resided there with her daughter in a two-bedroom apartment ever since. Mother described her current living situation as "quiet" and "safe." Mother indicated that her only employment outside the home at the time of trial was cleaning three houses on a weekly alternating basis, earning approximately $150 per month in addition to the public assistance she received. Mother stated that she planned "on either going back to school or getting a full-time job" when her youngest child became old enough for day care. Mother acknowledged that she continued to smoke marijuana as a means of coping with "PTSD [post-traumatic stress disorder] and stress and anxiety." Although Mother testified that she had sought mental health therapy and was currently seeing a therapist, she presented no documentation of mental health assessment or therapy.

As a longtime friend and former co-worker of Mother's, C.M. corroborated much of Mother's testimony concerning improvements in her housing situation, substance abuse, and mental outlook. He also praised Mother's relationship with her daughter and opined that Mother provided excellent care of and had developed a meaningful bond with her youngest child. Although C.M. purported to draw from his experience as a clinical social worker, he acknowledged that he had never assisted Mother in a professional capacity beyond making a few suggestions regarding available assistance. C.M. acknowledged surprise when confronted with Mother's testimony that she continued to use marijuana.

Father testified during trial that in the months after he obtained custody of the Child in August 2016, Mother would sometimes visit the Child at Maternal Grandmother's home when the Child was staying there. He stated that Mother had communicated with him only through Facebook messaging, reviewing some messages from Mother sent in late 2016, presented as an exhibit, in which Mother stated that she missed the Child and wanted to see the Child while Father responded by telling Mother that she needed to meet the requirements set forth in the juvenile court's December 2016 order before she could visit with the Child.

Father also reviewed a set of Facebook messages between the parents spanning the dates of October 4, 2017, through August 17, 2019, during which time Father received four messages from Mother asking to see the Child. Father acknowledged that in these four instances within a nearly two-year time span, Mother had "asked a couple of times if she could talk to [the Child], and if she could see [the Child]." His testimony and the messages indicate that Father consistently told Mother that she needed to meet the requirements in the December 2016 order concerning drug screens and mental health assessment in order to resume supervised visitation with the Child. Father stated that Mother had asserted at one time that she had completed all requirements but that she had never produced any documentation of having done so.

Father also testified that the Child had resided with Petitioners and their four-year-old daughter in their home in Mosheim, Tennessee, for the three years since he had been granted custody of the Child. He presented photographs of Petitioners' home, including the Child's individual bedroom and playground equipment in the backyard. Father stated that he was employed by FedEx and that Stepmother was not employed outside the home. Father described the Child's relationship with Stepmother as "really good," adding that the Child confided in Stepmother and that they had "their little mom and son secrets." According to Father, the Child had been earning "excellent" grades in elementary school and enjoyed extracurricular activities such as T-ball, basketball, and "Scouts." Father opined that the Child no longer had a meaningful relationship with Mother.

Stepmother corroborated Father's testimony regarding the Child's progress while living in their home and lack of interaction with Mother. Stepmother testified that she provided much of the routine daily care for the Child before and after school. Stepmother described her relationship with the Child as "great" and indicated that she loved the Child and desired to legally be his mother, a role she opined that she already fulfilled for him. Upon cross-examination, Stepmother stated that she had talked with the Child about Mother and that the Child knew Mother was his "real mom." She also testified, however, that the Child referred to Mother by her first name while he called Stepmother, "Mama." Stepmother acknowledged that she had told the Child that if Mama was "what he was comfortable calling [her], then that's what he could call [her]."

Petitioners' additional witness, A.P., testified that she had known Stepmother for seven or eight years and that Stepmother regularly babysat A.P.'s child in Petitioners' home for a few hours on weekday afternoons after school. A.P. described having witnessed a close relationship between Stepmother and the Child.

Although a transcript was filed in November 2019 of the trial court's oral ruling delivered at the close of trial, the trial court did not enter a final written order until February 25, 2020, incorporating the transcript of the oral ruling at that time. In its final

order, the trial court found by clear and convincing evidence that Mother had abandoned the Child by failing to visit him during the four months preceding the filing of the termination petition and that the conditions leading to removal of the Child from Mother's custody persisted. However, the trial court also found that Mother had successfully defended against the ground of abandonment by failure to financially support the Child because her failure to support had not been willful. Having determined that two statutory grounds had been established, the trial court further determined by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest. The trial court directed "guardianship rights" to the Child to be "vested in [Stepmother] for the purposes of adoption." Mother timely appealed.

## II. Issues Presented

On appeal, Mother presents three issues, which we have restated slightly as follows:

1. Whether the trial court erred in finding by clear and convincing evidence that Mother had abandoned the Child by failing to visit or have meaningful contact with him during the statutorily determinative period.

2. Whether the trial court erred in finding by clear and convincing evidence that the conditions leading to the Child's removal from Mother's custody were persistent and ongoing.

3. Whether the trial court erred in finding by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal

and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). In addition, as our Supreme Court has explained, this Court is required "to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 525.

IV. Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2020) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of two statutory grounds to terminate Mother's parental rights: (1) abandonment through

9

failure to visit the Child and (2) persistence of the conditions leading to the Child's removal from Mother's custody. We will address each statutory ground in turn.

### A. Abandonment by Failure to Visit

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2020) provides, as relevant to this action:

> (g)    Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
>> (1)    Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1) (Supp. 2020) provides in relevant part:

> (A)(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child; . . .

The trial court found that clear and convincing evidence demonstrated Mother's failure to visit "or have meaningful contact" with the Child during the four months preceding the filing of the termination petition. The four-month statutorily determinative period for purposes of abandonment by failure to visit or support began on July 19, 2018, and concluded on November 18, 2018, the day prior to the filing of the termination petition ("Determinative Period").[2] *See In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016) (citing *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085,

---

[2] We note that at the beginning of trial, the parties agreed that the statutorily determinative period for purposes of the abandonment grounds alleged in this action spanned July 19, 2018, through November 19, 2018. Because we find that this one-day difference in the conclusion of the determinative period does not affect our analysis of abandonment in this case, we determine the inclusion of the day of the petition's filing, November 19, 2018, in the determinative period to be harmless error. *See, e.g.*, *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb 20, 2014).

at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing)).

Mother does not dispute the trial court's finding that she did not visit the Child during the Determinative Period. Mother contends, however, that the trial court erred in finding clear and convincing evidence of this statutory ground because she purportedly carried her burden to demonstrate by a preponderance of the evidence that her failure to visit was not willful. Effective July 1, 2018, the General Assembly amended Tennessee Code Annotated § 36-1-102(1) to render the absence of willfulness to be solely an affirmative defense for cases filed as of the amendment's effective date. *See* 2018 Tenn. Pub. Acts, Ch. 875, § 2 (H.B. 1856). Inasmuch as the termination petition in the instant action was filed on November 19, 2018, the amendment eliminating "willfully" from this definition of statutory abandonment applies, *see id.*, as does the following statutory subsection added by the amendment:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2020).

In its oral ruling incorporated into the final order, the trial court noted that "it's a defense for [Mother] if the failure to visit . . . was not 'willful.'" The trial court then specified the following, in pertinent part, regarding the statutory ground of abandonment by failure to visit:

> The [juvenile] court specifically said [Mother] can visit. But then a couple of clicks later, the court put some hooks on it. Put some conditions on it, and they're not, in my experience in the legal field for twenty some-odd years, they're not very hard conditions. . . . This is just a very simple agreement to which [Mother] signed [her] name, whether [she] read it or understood it or not, [she] signed [her] name to it. It became an order of the court. Once [the juvenile court] signed off on it and made it an order in November of 2016, I don't see anything, I've not been shown anything by [Mother's] lawyer, where [she] ever challenged that or anything. And those conditions are not that bad.

11

[Mother's] admission that [she] still to this day can't pass a drug test for marijuana is a very significant admission . . . . It has legal effect. . . . [Mother has] a friend up here in [C.M.] . . . . He's a good one. But he's somewhat misinformed about [Mother's] conduct . . . . And I don't think that the truth would deter him from bragging on [Mother], but I do think he didn't quite possess all the facts that he needed to back up some of his opinions that he gave. But at any rate, he came here and he stuck up for [Mother], and the Court appreciates him. The Court appreciates his attitude toward the system, and he's been involved in it. He's a very able-bodied witness in a case like this. But the Court can't quite take everything he said for a hundred percent because he was a little bit misinformed by [Mother]. And the fact that [Mother] can't pass a drug test means that, in my opinion – I agree with the Guardian Ad Litem – when this Order says father – approval not to be unreasonably held by the father for visitation, the Court believes the father was reasonable in not accommodating [Mother's] visitation until [she] showed him a clean drug screen. We now know that [Mother was] taking drug screens the whole time and they weren't clean.

For that, and other reasons, I do think by clear and convincing evidence that the ground of failure to visit has been proven[.]

Although the trial court did not expressly state that Mother's failure to visit was willful, the court did state that the ground had been proven while also noting Mother's willfulness defense. We therefore determine that the finding of willfulness in the establishment of the ground over Mother's defense was clearly implied within the trial court's order. The trial court specifically found that in failing to visit the Child during the determinative period, Mother had failed to meet the requirements set forth in the juvenile court's December 2016 order to allow resumption of visitation with the Child; that those requirements were not overly onerous; that Father had been reasonable in refusing to accommodate Mother's occasional requests for visits until she could produce a clean drug screen; and that Mother admittedly, even at the time of trial, could not have passed a drug screen as required by the juvenile court's order due to her marijuana use. Upon thorough review of the record, we agree with the trial court on these points.

In support of her argument that her failure to visit the Child during the Determinative Period was not willful, Mother primarily contends that Petitioners "thwarted" her efforts to visit "every step of the way." We disagree. Our review of the Facebook messages between the parents reveals that although Father was not particularly pleasant or welcoming in response to Mother's occasional requests to visit the Child, he did consistently refer to the visitation requirements of the juvenile court's December 2016 order and inform Mother that she could visit the Child when she met the

12

requirements. A parent's failure to visit a child is not excused by another person's conduct "unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (internal citations omitted).

The requirements in the December 2016 order upon which Petitioners rely were as follows:

> Mother to be required to pass drug screens, participate in mental health assessment and counseling, obtain employment, obtain suitable housing, and establish and maintain a stable life.

> Mother to execute releases for counselor to release information to Father and Court.

> Mother to have a drug screen monthly and upon probable cause demand by Father within 24 hours; results provided to Court at her expense. To cease on 3 consecutive passed monthly drug screens, except on demand screens.

(Paragraph numbering omitted.) At the outset, we note that Mother was visiting with the Child initially in late 2016 at Maternal Grandmother's home, although the number and duration of these visits is not clear from the record. At issue are Father's denials of visitation to Mother when she sporadically began to make requests to resume visitation after periods of not seeing the Child. According to testimony and the Facebook messages, Mother made approximately four requests within nearly a two-year time span inclusive of the Determinative Period.

The list of the requirements in the first paragraph quoted above from the December 2016 order contain a mix of initially short-term, measurable tasks for which Mother could have provided documentation to Father (pass a drug screen and undergo a mental health assessment) and long-term, broader goals (establish and maintain a stable life). We emphasize that we do not find that it would have been reasonable for Petitioners to have interpreted the December 2016 order as requiring Mother to "establish and maintain a stable life" before she could resume supervised visitation with the Child. However, Father's demands in his messages to Mother, and as Mother herself described them in testimony, were that she present proof of a clean drug screen and mental health assessment or counseling before she could resume visitation. We determine these demands to be reasonably aligned with the December 2016 order, particularly the specific requirement in the order that Mother "have a drug screen monthly and upon probable

13

cause demand by Father within 24 hours" with the "results provided to [the juvenile court] at her expense."

We recognize Mother's testimony that despite her agreement during mediation to sign releases for the juvenile court and Father to obtain information, she did not want Father to have full access to her mental health records. However, Mother presented no proof that she had attempted to even partially comply with this requirement by any means, which may have included providing sealed documentation to the juvenile court or to Father's counsel or even simply documentation that she had undergone a mental health assessment without providing the content of such. Mother testified that she had sought mental health counseling and was in counseling at the time of trial; however, she produced no documentation to support this claim.[3]

Mother acknowledged that at the time the Child was removed from her custody and placed with Father, she had spiraled deeply into substance abuse as a way to cope with grief, stress, and anxiety, and that she "just wasn't functional." Although Mother related that she did not understand all of the ramifications of the Mediated Agreement when she entered into it, she did undisputedly sign the agreement. As the trial court found, considering the situation that Mother had been in at the time of removal, the juvenile court's requirements that she produce documentation of a clean drug screen and participation in "mental health assessment and counseling" in order to maintain visitation with the Child were not unreasonable. When questioned regarding whether she had attempted to meet any of the requirements, Mother responded: "I had drug tests, but there's marijuana in my system, and from what I understand, unless I had a clean drug screen, I'm not able to see him." Mother's response indicates that she understood the path forward to initiate visits with the Child and did not follow it.

In support of her contention that Petitioners prevented her from visiting the Child, Mother relies on this Court's decision in *In re Justin P.*, No. M2017-01544-COA-R3-PT, 2018 WL 2261187 (Tenn. Ct. App. May 17, 2018) as "very applicable" to the case at bar. To the contrary, we find *Justin P.* to be factually distinguishable. In *Justin P.*, the parties, as part of their prior divorce proceedings, had entered into a permanent parenting plan order that contained a "'special provision'" stating that the parties would not "'consume alcohol and/or drugs in the presence of the minor children'" and that if the mother became "'abusive during residential sharing, the children may call the father to pick them up.'" *In re Justin P.*, 2018 WL 2261187, at *1. The father and stepmother subsequently filed a petition to terminate the mother's parental rights on the ground of, as pertinent on appeal, willful failure to visit as governed by the prior version of the statute. *Id.* at *1-2.

---

[3] Mother did testify that at one point she had brought a letter written by her therapist to the juvenile court clerk's office but that upon learning that a termination petition had been filed against her, she had not filed the letter.

The trial court in *Justin P.* found clear and convincing evidence of this statutory ground while also finding, *inter alia*, that the father had "'unilaterally stopped'" the mother's visitation "'[a]fter the children had reported to [Father] that [Mother] had endangered them with her conduct related to drinking.'" *Id.* at *3. This Court reversed the trial court's finding, determining that the special provision in the permanent parenting plan, which again provided only that the children could call the father to pick them up if the mother began drinking or became abusive, did "not give Father the right, without court approval, to unilaterally stop Mother's visitation, nor [did] it give Father the authority to convert her unsupervised visitation to supervised visitation and then to use her failure to visit as a ground to terminate her parental rights." *Id.* at *4.

In contrast, Father's demands in the instant action that Mother provide documentation of a clean drug screen and some type of mental health assessment prior to resumption of supervised visitation with the Child were aligned with the requirements in the juvenile court's December 2016 order. Father did not unilaterally stop Mother's visitation or convert her visitation from unsupervised to supervised without court approval as the father did in *Justin P. See id.* When questioned regarding the provision for a supervised visitation schedule in the December 2016 order that would permit "Mother's time in visitation to increase as she progresses in dealing with her issues," Father testified that the initial schedule was intended to be "a transitional period" once Mother met the requirements but that "she never made it that far." The record reveals no indication that Father ever prevented Mother from providing the juvenile court or him with documentation of compliance with the requirements of the juvenile court's order.

We emphasize that under the applicable version of the statute, the burden of proof for this affirmative defense is upon Mother. *See* Tenn. Code Ann. § 36-1-102(1)(I); *In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *13 (Tenn. Ct. App. July 15, 2019) ("Under Tenn. Code Ann. § 36-1-102(1)[(I)], willfulness is an affirmative defense; thus, the burden is upon [the parent] to establish that his failure to visit was not willful."). As this Court has previously explained:

> Willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent acted with malice or ill will. *In re Audrey S.,* 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. *In re Audrey S.*, 182 S.W.3d at 863. "A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control." *In re Adoption of*

15

*Angela E.*, 402 S.W.3d [636,] 640 [(Tenn. 2013)] (citing *In re Adoption of A.M.H.*, 215 S.W.3d [793,] 810 [(Tenn. 2007)] (holding that the evidence did not support a finding that the parents "intentionally abandoned" their child)).

*In re Alysia S.*, 460 S.W.3d 536, 565-66 (Tenn. Ct. App. 2014). The evidence does not preponderate against a finding that Mother failed to carry her burden of proof to establish lack of willfulness as an affirmative defense.

We therefore conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Mother failed to visit the Child during the determinative period. The trial court did not err in terminating Mother's parental rights to the Child based upon this statutory ground.

### B. Abandonment by Failure to Support

In the conclusion of Petitioners' appellate brief, they state within a set of parentheses: "it is also respectfully submitted that the Mother, by clear and convincing evidence, abandoned the child by failing to support the child." The trial court found that Petitioners had not proven this statutory ground by clear and convincing evidence upon determining that Mother had successfully established lack of willfulness as an affirmative defense to her failure to support the Child. *See* Tenn. Code Ann. §§ 36-1-102(1)(A)(i), 36-1-102(1)(I). Petitioners did not raise this issue in their statement of the issues. *See Champion v. CLC of Dyersburg, LLC*, 359 S.W.3d 161, 163 (Tenn. Ct. App. 2011) ("An issue not raised in an appellant's statement of the issues may be considered waived."). Because Petitioners failed to properly raise an issue concerning the statutory ground of failure to support, we deem the issue waived on appeal.

### C. Persistence of Conditions Leading to the Child's Removal

The trial court also found clear and convincing evidence of the statutory ground of persistence of the conditions leading to removal of the Child from Mother's home or physical and legal custody. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (Supp. 2020) provides:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B)     The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Under the current version of this statutory section, governing here, a threshold requirement for application of this ground is that it be based on an order removing the child that was "entered at any stage of proceedings in which <u>a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child</u>." Tenn. Code Ann. § 36-1-113(g)(3)(A) (emphasis added).[4] Upon careful review, we determine that Petitioners failed to establish this threshold requirement.

The juvenile court's order removing the Child from Mother's physical and legal custody to award temporary custody to Father was entered on November 21, 2016, *nunc pro tunc* to August 30, 2016. The juvenile court noted in the order that it had heard the matter "on the Petition for Emergency Custody" filed by Father. However, Father's emergency petition is not in the record, and the juvenile court did not note either in the temporary custody order or its subsequent order approving the parties' mediated agreement whether Father had specifically alleged in his petition that the Child was dependent and neglected as to Mother.

---

[4] In contrast, under the prior version of the statute, which as to this ground governed termination petitions filed prior to July 1, 2018, this ground was applicable only if a juvenile court had adjudicated the child to be dependent and neglected as to the parent or parents whose parental rights were at issue. *See In re Audrey S.*, 182 S.W.3d at 876 (reversing the trial court's finding of clear and convincing evidence of the statutory ground of "persistence of conditions" because the juvenile court's order changing custody of the child from the father to the mother "contain[ed] no express judicial finding of dependency, neglect, or abuse, and an order changing custody of a minor child does not necessarily imply such a finding") (citing the version of Tenn. Code Ann. § 36-1-113(g)(3) then in effect).

The trial court in its final order analyzed the persistence of the conditions set forth in the November 2016 order without noting the absence of Father's emergency petition or questioning whether Father had made allegations during the juvenile court proceedings that the Child was a dependent and neglected child. We note that neither party has addressed this threshold requirement on appeal. However, given the precious and fundamental constitutional rights at stake, this Court must review whether every element of a statutory ground for termination of Mother's parental rights has been met. *See In re Carrington H.*, 483 S.W.3d at 524.

Within the context of a jurisdictional dispute, this Court has previously reviewed the substance of a parent's petition to determine whether the allegations amounted in substance to allegations of dependency and neglect, pursuant to the statutory definition of a dependent and neglected child, when the petitioning parent failed to invoke the statutory language in the petition. *See Cox v. Lucas*, No. E2017-02264-COA-R3-CV, 2018 WL 5778969, at *7 (Tenn. Ct. App. Nov. 2, 2018), *reversed on other grounds by Cox v. Lucas*, 576 S.W.3d 356 (Tenn. 2019) (determining that allegations in the father's petition for emergency custody "were tantamount to allegations of dependency and neglect" based on the statutory definition). Having been provided with no juvenile court petition to enable us to make this comparison, we have examined the juvenile court's orders for findings related to allegations of dependency and neglect, comparing the juvenile court's findings to the statutory definition.

Tennessee Code Annotated § 37-1-102(b)(13) (Supp. 2019) provides that a dependent and neglected child is one

    (A)    Who is without a parent, guardian or legal custodian;

    (B)    Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child;

    (C)    Who is under unlawful or improper care, supervision, custody or restraint by any person, corporation, agency, association, institution, society or other organization or who is unlawfully kept out of school;

    (D)    Whose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child;

(E)     Who, because of lack of proper supervision, is found in any place the existence of which is in violation of law;

(F)     Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;

(G)     Who is suffering from abuse or neglect;

(H)     Who has been in the care and control of one (1) or more agency or person not related to such child by blood or marriage for a continuous period of six (6) months or longer in the absence of a power of attorney or court order, and such person or agency has not initiated judicial proceedings seeking either legal custody or adoption of the child;

(I)     Who is or has been allowed, encouraged or permitted to engage in prostitution or obscene or pornographic photographing, filming, posing, or similar activity and whose parent, guardian or other custodian neglects or refuses to protect such child from further such activity; or

(J)(i)  Who has willfully been left in the sole financial care and sole physical care of a related caregiver for not less than eighteen (18) consecutive months by the child's parent, parents or legal custodian to the related caregiver, and the child will suffer substantial harm if removed from the continuous care of such relative;

(ii)    For the purposes of this subdivision (b)(13)(J):

    (*a*)   A related caregiver shall include the child's biological, step or legal grandparent, great grandparent, sibling, aunt, uncle or any other person who is legally or biologically related to the child; and

    (*b*)   A child willfully left with a related caregiver as defined in subdivision (b)(13)(J)(ii)(*a*) because of the parent's military service shall not be subject to action pursuant to § 37-1-183[.]

In its November 2016 order, the juvenile court found that Mother was "struggling to care for herself and the parties' minor child" and that she did "not have a stable

19

residence and [was] unemployed" such that she could not "provide for the child financially." In the December 2016 order, the juvenile court approved the parties' mediated agreement as "fair and equitable" and "in the best interest of the child" but made no specific findings related to allegations against Mother. Although the juvenile court stated in its November 2016 order that the matter was set for "final hearing" in December 2016, the juvenile court did not state in either order that the hearing giving rise to the order was a preliminary, adjudicatory, or dispositional hearing based on allegations of dependency and neglect. *See In re Audrey S.*, 182 S.W.3d at 874 ("The statutes and rules governing procedure in the juvenile courts provide for three types of hearings in cases where a child is alleged to be dependent, neglected, or abused: (1) preliminary hearings; (2) adjudicatory hearings; and (3) dispositional hearings.").

The juvenile court's finding that Mother was "struggling to care for herself and the parties' minor child" may indicate neglect of the Child, but whether the Child actually suffered neglect as part of Mother's "struggling" is unclear from the juvenile court's findings. *See* Tenn. Code Ann. § 37-1-102(b)(13)(G). Likewise, this finding could indicate that Mother was "unfit" to provide care for the Child, but it is certainly not clear from the juvenile court's order that this was "by reason of cruelty, mental incapacity, immorality or depravity." *See id.* at § 37-1-102(b)(13)(B). We conclude that whether Father alleged that the Child was a dependent and neglected Child in his emergency petition cannot be discerned from the juvenile court's findings.

Having determined that Petitioners have failed to provide this Court or the trial court with Father's juvenile court petition and that whether Father alleged that the Child was a dependent and neglected child in his juvenile court petition is not discernible from the juvenile court's orders, we further determine that the statutory ground of persistence of the conditions leading to removal of the Child is not applicable to this action. We therefore reverse the trial court's finding as to this statutory ground for termination of Mother's parental rights.

V. Best Interest of the Child

Mother contends that Petitioners did not present sufficient evidence to support the trial court's finding by clear and convincing evidence that termination of her parental rights was in the best interest of the Child. We disagree. When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated §

36-1-113(i) (Supp. 2020) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or

21

guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878.

22

And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the instant action, the trial court concluded that the statutory factors weighed against maintaining Mother's parental rights to the Child. In its oral ruling incorporated into the final order, the trial court specifically found regarding these factors:

I now proceed on to the best interest analysis, and summarily I do say that the Court finds it's in the best interest for this termination to occur. And I find that by clear and convincing evidence, and I think the overriding factor for the Court – and I'm considering all nine of these factors, and I'm going to go through them individually – but the overriding factor for the Court is stability. And the fact that we don't have to wait, we don't have to continue to work with somebody, I mean we've got stability here, available, and that's the overriding factor to the Court. This child deserves a stable, safe, loving environment, and I believe that the adoptive parents can provide that.

With respect to the exact factors in the statute, number one is . . . whether the parent or guardian has made such an adjustment of circumstance, conduct, conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian. As the Guardian Ad Litem pointed out when he argued, [Mother's] own admissions are that [she

23

is] still conducting illegal activity, whether [she] look[s] at it that way or not. That weighs in favor of termination, in the Court's opinion.

Number two, whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services for such duration or time that lasting adjustment does not reasonably appear possible. Insofar as this is not a DCS [Department of Children's Services] case, I'm of course not going to consider that factor.

Number three, whether the parent or guardian has maintained regular visitation or contact with the child. That weighs in favor of termination.

Number four, whether a meaningful relationship has otherwise been established between the parent and the guardian and the child. As the Guardian Ad Litem acknowledged when he argued, and the Court believes the argument is valid, [Mother] had a relationship, but it's gone by the wayside because [Mother] continue[s] to smoke marijuana. I mean, basically – I know [Mother] had a lot of other stuff going on, and I know that in [her] mind [she] feel[s] like [she] needed that marijuana [to keep] from doing something much more nefarious in [her] own mind, but at the same time, the Court has to look at the facts in kind of a cold-hearted way, calculating way, and that's the facts. So that weighs in favor of termination.

Number five, the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition. I do think it would damage the child emotionally if the child went back into [Mother's] custody.

Number six, whether the parent or guardian or other person residing with the parent or guardian has shown brutality, physical, sexual, emotional, or psychological abuse, or neglect toward the child or another child or adult in the family or household. Again, I agree with the Guardian Ad Litem that that one doesn't apply here.

Number seven, whether the physical environment of the parent's or guardian's home is healthy, safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances or substance analog[ues] as may render the parent or guardian consistently unable to care for the child in a safe and stable manner. I don't find that those things exist in the father's household. The father runs a good

24

household, free of criminal and controlled substances. Criminal activity and controlled substances. Mother does not, just to sum it up.

Number eight, whether the parent's or guardian's mental [] and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child. The Court finds that the mother has been through a very, very low point, low points in her life. Some of it maybe she brought on herself, some of it was due to outside circumstances. But she has been unable to take care of this child, and just now presently getting back to the point where she probably could take care of the child. She admits that she can't take care of the child financially at the present time, but she believes, and [C.M.] believes, that she's getting to the point where she can take care of the child. But again, I think that weighs in favor of termination, because she's really – if she's there, she just got there.

Number nine, whether the parent or guardian has paid child support consistent with the child support guidelines. That weighs in favor of termination. I don't see any willful qualifications in that particular statute, and I just summarily say that she hasn't paid, she admits she hasn't paid, and therefore she's not financially supported the child, and that would weigh in favor of termination.

So, all those findings with regard to best interest are made by clear and convincing evidence standard[.]

The trial court expressly found that the following factors weighed against maintaining Mother's parental rights to the Child: factor one (whether Mother had made an adjustment of circumstance, conduct, or conditions), factor three (whether Mother had maintained regular visitation or other contact), factor four (whether a meaningful relationship had been established between Mother and the Child), factor five (the effect a change of caretakers and physical environment would have on the Child), factor seven (whether the physical environment of Mother's home is healthy and safe), factor eight (whether Mother's mental and/or emotional status would prevent her from effectively providing safe and stable care and supervision for the Child), and factor nine (whether Mother had paid child support).

The trial court found that two statutory factors were inapplicable to the best interest analysis. As the trial court noted, factor two (whether a parent has effected a lasting adjustment after reasonable efforts by made by social service agencies) is not applicable because neither the Department of Children's Services nor any other social

services agency was involved in this action. As to factor six (whether Mother had shown abuse or neglect toward the Child), the trial court found persuasive a statement made by the GAL during his closing recommendation that factor six did "not apply." We note that Mother arguably admitted to her own neglect of the Child during the time period prior to the Child's removal from her custody when Mother was living "at the river" and apparently left the Child in Maternal Grandmother's primary care. Father testified that after viewing a video that had been on the Child's iPad when the Child was in Mother's custody, Father became concerned that the Child "was not in a safe place and was not being watched the way he should have been." However, Father made no specific allegations during these proceedings regarding the care the Child had received other than to allege that Maternal Grandmother, rather than Mother, had been the Child's primary caregiver for most of his first five years. Father acknowledged that the Child was in no way developmentally delayed when he came into Father's custody. We determine that factor six weighs neither for nor against termination of Mother's parental rights.

In support of her argument that the trial court erred in finding that it was in the Child's best interest to terminate her parental rights, Mother first asserts that the trial court should have found factor nine concerning her nonpayment of child support to be inapplicable because she was under no court order to pay support. However, it is well established that a parent's "obligation to pay support exists even in the absence of a court order to do so." *State, Dep't of Children's Servs. v. Culbertson,* 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004); *see also* Tenn. Code Ann. § 36-1-102(1)(H) (Supp. 2020) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"). Mother's argument in this regard is unavailing.

Mother next asserts that factors one, four, and seven "must be found in her favor" because, respectively, she made an adjustment in her conditions, had a meaningful relationship with the Child at one time, and was confronted with no proof that her home was unsafe. As to factor one, this argument fails to take into account that the parent's "adjustment of circumstance, conduct, or conditions" must be "as to make it safe and in the child's best interest to be in the home of the parent or guardian." *See* Tenn. Code Ann. § 36-1-113(i)(1). The trial court found that Mother had improved her circumstances and commended Mother on her progress to date. However, the trial court also found that Mother was "still conducting illegal activity" in the form of regular marijuana use, placing the safety and stability of her home in question. This finding also implicates factor seven and the "physical environment" of Mother's home due to the use of "controlled substances . . . as may render the parent or guardian consistently unable to care for the child in a safe and stable manner." *See id.* at § 36-1-113(i)(7).

Regarding factor four, the trial court found that Mother "had a relationship, but it's gone by the wayside." Mother argues that this factor should weigh in her favor because "a meaningful relationship had been [in] existence at one time." However, this Court has previously recognized that "[a]n absence of contact between a parent and child for an extended period of time can lead to, in effect, the 'death' of the relationship." *See In re Dylan S.*, No. E2018-02036-COA-R3-PT, 2019 WL 5431878, at *4 (Tenn. Ct. App. Oct. 23, 2019) (citing *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *16 (Tenn. Ct. App. June 16, 2011)). Mother testified at trial that when she saw the Child "on [a] Facebook call when [her] niece snuck and showed [her the Child] on videos," "[i]t was the first time [she had] seen him in three years." Testimony regarding the Child's attitude toward Mother supported and the GAL's recommendation reinforced the trial court's finding that a meaningful relationship between Mother and the Child no longer existed at the time of trial. The evidence does not preponderate against the trial court's findings concerning factors one, four, and seven.

Finally, Mother argues that factors three and five should not weigh against maintaining Mother's parental rights to the Child. Having determined that the statutory ground of abandonment by failure to visit was established by clear and convincing evidence, we further determine that Mother's argument concerning factor three is unavailing. As to factor five, Mother posits that any evidence presented that the Child's "routine would be disrupted if [Mother's] bonds with him could be restored" was "inconsequential." To the contrary, the trial court in its best interest analysis focused on the Child's need for stability, finding that Petitioners could provide "a stable, safe, loving environment" for the Child. Moreover, given Mother's admittedly sporadic history of attempts to reconnect with the Child, the evidence does not preponderate against the trial court's finding that a change of caretakers and physical environment to Mother's care would likely "damage the child emotionally."

Based on our thorough review of the evidence in light of the statutory factors, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. Having also determined that a statutory ground for termination was established, we affirm the trial court's termination of Mother's parental rights to the Child.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's finding regarding the statutory ground of persistence of the conditions leading to removal of the Child from Mother's custody. We affirm the trial court's judgment in all other respects, including the termination of Mother's parental rights to the Child. This case is remanded to the

trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights and collection of costs assessed below. Costs on appeal are assessed equally to the appellant, Sarah M, and the appellees, Andy G. and Jamie G.

_____

THOMAS R. FRIERSON, II, JUDGE